IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SHIRLEY F. WADE,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:13cv00021 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Shirley F. Wade, ("Wade"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

-1-

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wade protectively filed her applications for SSI and DIB on February 3, 2010, alleging disability as of December 2, 2009, due to lung problems, female problems, back problems and chronic obstructive pulmonary disease, ("COPD"). (Record, ("R."), at 59, 181-82, 188-94, 211.) The claims were denied initially and upon reconsideration. (R. at 99-101, 106-08, 113-15, 119, 120-22, 124-29, 131-33.) Wade then requested a hearing before an administrative law judge, ("ALJ"). (R. at 134.) A hearing was held on March 26, 2012, at which Wade was represented by counsel. (R. at 31-58.)

By decision dated June 6, 2012, the ALJ denied Wade's claims. (R. at 16-25.) The ALJ found that Wade met the disability insured status requirements of the Act for DIB purposes through June 30, 2013. (R. at 18.) The ALJ found that Wade had not engaged in substantial gainful activity since December 2, 2009, the alleged onset date. (R. at 18.) The ALJ found that the medical evidence established that Wade had severe impairments, namely degenerative disc disease of the lumbar spine, COPD, right shoulder tear, depression and anxiety, but the ALJ found that Wade did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ found that Wade had the residual functional capacity to perform simple, routine, repetitive, light work,[1] that required her to

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2013).

only occasionally climb ladders, ropes, scaffolds, ramps or stairs, occasionally stoop, kneel, crouch or crawl and reach overhead with her right upper extremity, that did not require concentrated exposure to extreme cold, heat, humidity and irritants such as fumes, gases, odors, dust or poorly ventilated areas and that required only occasional interaction with the public and co-workers. (R. at 20.) The ALJ found that Wade was able to perform her past relevant work as an assembler/auto manufacturer. (R. at 23.) In addition, based on Wade's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed that Wade could perform, including jobs as a merchandise marker, a checker or warehouse checker and an office mail clerk. (R. at 24.) Thus, the ALJ concluded that Wade was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 24-25.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2013).

After the ALJ issued his decision, Wade pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 1-3.) Wade then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2013). This case is before this court on Wade's motion for summary judgment filed October 28, 2013, and the Commissioner's motion for summary judgment filed February 14, 2014.

## II. Facts

Wade was born in 1958, (R. at 59, 181, 188), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20

C.F.R. §§ 404.1563(d), 416.963(d). Wade has a high school education and vocational training as a certified nurse's assistant. (R. at 212.) She has past work experience as a home attendant, a nurse's aide, a machine operator and an assembler. (R. at 213.) Wade testified at her hearing that she had attempted suicide twice by medication overdose. (R. at 40.) She stated that she was receiving treatment from Scott County Behavioral Health on a monthly basis. (R. at 41.) Wade stated that, despite taking medication, she still experienced panic attacks. (R. at 41.)

Vocational expert, Mark Heilman, testified at Wade's hearing. (R. at 49-57.) Heilman stated that Wade's past work as a nurse's aide, machine operator, home attendant and residential tech were medium,[2] semi-skilled work, that her job as an assembler was light, unskilled work and her jobs as a checker and marker were medium, unskilled. (R. at 52-53.) The ALJ asked Heilman to consider a hypothetical individual who could perform simple, routine, repetitive light work, who could only occasionally climb ladders, ropes, scaffolds, ramps and stairs, who could occasionally stoop, kneel, crouch and crawl, who could occasionally engage in overhead reaching with the right upper extremity, who should avoid concentrated exposure to extreme cold and heat, humidity and irritants, such as fumes, odors, dusts, gases and poorly ventilated areas, who had no postural limitations and who could perform tasks requiring only occasional interaction with the public and co-workers. (R. at 53-54.) Heilman testified that such an individual could perform Wade's past work as a window parts assembler. (R. at 54.) Heilman also identified jobs that existed in significant numbers at the light, unskilled level

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2013).

that such an individual could perform, including jobs as a marker or merchandise marker, a checker or warehouse checker and an office mail clerk. (R. at 54-55.)

Heilman stated that there would be no jobs available that the individual could perform should the individual miss three or more days of work per month, be off task 20 to 25 percent of the workday or had marked limitations in his abilities to maintain attention and concentration, to be reliable and to complete a normal workday or work week. (R. at 55-57.)

In rendering his decision, the ALJ reviewed records Dr. John Sadler, M.D., a state agency physician; Dr. Michael Hartman, M.D., a state agency physician; Wellmont Holston Valley Medical Center; Mountain Region Family Medicine; Dr. Robert Rosser, M.D.; Dr. Nazia I. Shehzad, M.D.; University of Virginia Hospital; and Frontier Health.

On October 12, 2003, Wade was admitted to Holston Valley Medical Center, ("Holston Valley"), after attempting suicide by medication overdose. (R. at 284-89.) She reported that she had recently gone through a divorce, that her son had left home and planned to get married and that she had lost her job the previous day. (R. at 289.) She was discharged on October 16, 2003, with a diagnosis of overdose; suicide attempt; depression; and urinary tract infection. (R. at 289.) On January 17, 2008, Wade presented to the emergency room for complaints of lower back, leg and abdominal pain. (R. at 340-44.) X-rays of Wade's abdomen showed mild dextroscoliosis of the lumbar spine and fecal retention. (R. at 343.) She was diagnosed with probable gastritis, rule out gastrointestinal bleeding, and urinary tract infection. (R. at 341.) On October 27, 2010, Wade presented to the emergency

room for complaints of shortness of breath. (R. at 353-55.) A chest x-ray was normal. (R. at 355.) She was diagnosed with acute bronchitis. (R. at 354.)

Dr. Wesley Eastridge, M.D., a family medicine physician, with Mountain Region Family Medicine, ("Mountain Region"), provided Wade with gynecological treatment as well as treatment for sciatica, emphysema and COPD. (R. at 291-98, 322-28, 357.) On January 23, 2010, Wade presented to the emergency room at Holston Valley for complaints of shortness of breath and chest pain. (R. at 300-02, 348-50.) Wade reported that she had not taken medication for her pulmonary issues since 2002 due to lack of insurance.[3] (R. at 300.) She had a depressed mood. (R. at 301.) A chest x-ray was normal. (R. at 302, 350.) She was diagnosed with dyspnea, acute bronchitis and acute COPD. (R. at 301, 349.) At a follow-up visit with Dr. Eastridge on February 5, 2010, Wade's cardiac examination yielded normal findings, and she exhibited normal respiratory effort. (R. at 295.) Wade exhibited lumbar spine tenderness, normal deep tendon reflexes, the ability to toe-heel walk and normal range of back flexion motion. (R. at 295.) Dr. Eastridge opined that Wade was unable to work any gainful employment due to COPD, lumbago, arthritis, and abnormal uterine bleeding. (R. at 295.) He recommended that Wade stop smoking completely and apply for SSI. (R. at 296.) On February 26, 2010, Wade reported that she had stopped smoking. (R. at 293, 296.) She reported that her husband left her and that she had no income other than child support from her first husband. (R. at 291-92.) Examination revealed normal cardiac findings and respiratory effort, lumbar tenderness, normal range of hip motion, normal deep tendon reflexes and normal strength. (R. at 292-93.) Wade stated that she planned to "[r]equest SSI now that husband is gone." (R. at 293.)

---

[3] On May 30, 2002, a chest x-ray showed hyperinflation suggestive of obstructive lung disease. (R. at 356-57.)

Dr. Eastridge reported that Wade remained disabled due to her severe lumbago. (R. at 293.)

On May 3, 2010, Dr. Eastridge's examination revealed Wade had normal respiratory effort, pulse oximetry rate at 99 percent, normal chest inspection and scattered rhonchi sounds in her lungs. (R. at 323.) On June 15, 2010, Wade complained of shortness of breath on exertion. (R. at 333-34.) She reported that medication was helping with stress. (R. at 333.) Wade stated that she had a bloody discharge for two days after mowing her yard. (R. at 333.) She reported pelvic pain after standing a lot. (R. at 333.) Dr. Eastridge reported that Wade's recent memory was normal, and she had normal judgment, insight, orientation, mood and affect. (R. at 334.) On August 11, 2010, Wade complained of dizziness with daily headaches, back pain, blurred vision and difficulty remembering things. (R. at 331-33.) Wade reported being "stressed that she was disabled," and noted that her husband wanted more money in their divorce proceedings. (R. at 331.) Dr. Eastridge opined that Wade was unable to work due to COPD and sciatica. (R. at 332.)

On May 25, 2010, Dr. John Sadler, M.D., a state agency physician, reported that Wade had the residual functional capacity to perform light work. (R. at 63-65.) Dr. Sadler opined that Wade could stand and/or walk for only four hours. (R. at 64.) He found that Wade could occasionally climb ladders, ropes and scaffolds, stoop, kneel and crawl. (R. at 64.) Dr. Sadler found that Wade could frequently crouch. (R. at 64.) No manipulative, visual or communicative limitations were noted. (R. at 64.) Dr. Sadler found that Wade should avoid concentrated exposure to temperature extremes, humidity and work hazards, including moving machinery

and heights. (R. at 64-65.) He also found that Wade should avoid moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 65.)

On November 2, 2010, Dr. Michael Hartman, M.D., a state agency physician, found that Wade had the residual functional capacity to perform light work. (R. at 75-77.) He found that Wade could occasionally climb ladders, ropes and scaffolds, stoop and crawl. (R. at 75-76.) No manipulative, visual or communicative limitations were noted. (R. at 76.) Dr. Hartman found that Wade should avoid concentrated exposure to temperature extremes and humidity and should avoid moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 76.)

On November 11, 2010, Wade sought mental health treatment at Frontier Health for increased stress and anxiety. (R. at 443-45.) Wade was diagnosed with major depressive disorder, panic disorder with agoraphobia and nicotine dependence. (R. at 444.) Wade's then-current Global Assessment of Functioning score, ("GAF"),[4] was assessed at 45.[5] (R. at 444.) On December 8, 2010, Wade reported that her depression began when she was a child. (R. at 439.) She reported that she was placed in foster care at age seven and that she was physically and verbally abused. (R. at 439.) Dr. Rhonda Bass, M.D., a staff psychiatrist, diagnosed recurrent, severe, major depressive disorder and nicotine dependence. (R. at 440.) Dr. Bass assessed Wade's then-current GAF score at 50. (R. at 440.) On December

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning…." See DSM-IV at 32.

21, 2010, Wade reported that she was doing well and that the medication was helping with her mood. (R. at 436-37.) It was noted that Wade was psychiatrically stable. (R. at 437.) On January 5, 2011, Wade reported that she was doing better on medication, and she denied overwhelming anxiety, depression or mood swings. (R. at 435.) Her mood was described as mildly depressed. (R. at 435.) On January 5, 2011, Wade reported that she felt better overall. (R. at 434.) On February 2, 2011, Wade again reported that she was doing well. (R. at 433.) She was taking her medication as prescribed with no side effects. (R. at 433.) It was noted that Wade was psychiatrically stable. (R. at 434.) On April 14, 2011, Wade reported doing well, stating that she had been working in the yard. (R. at 431.) She exhibited a euthymic mood and congruent affect. (R. at 431.)

On December 10, 2010, Wade saw Dr. Nazia I. Shehzad, M.D., to establish a treatment relationship for complaints of depression, sleep disturbance, short-term memory problems and back pain. (R. at 382-86.) Examination revealed that Wade was alert, oriented and depressed looking. (R. at 383.) She had S1 joint tenderness, negative straight leg raising tests bilaterally, normal reflexes and an unremarkable gait. (R. at 383.) Dr. Shehzad diagnosed depression with anxiety, COPD, migraine headache and low back pain. (R. at 383.) On January 3, 2011, Dr. Shehzad diagnosed bronchitis, not otherwise specified, and wheezing. (R. at 380-81.) On February 1, 2011, Wade reported that her medication "made a difference" in her headaches. (R. at 378.) She reported smoking again. (R. at 378.) Examination showed normal findings, including chest and lung findings. (R. at 378-79.)

On April 1, 2011, Wade continued to complain of depression, low back pain and headaches. (R. at 376-77.) She stated that she experienced a migraine headache twice a week. (R. at 376.) Dr. Shehzad reported that Wade was in no acute distress.

(R. at 377.) Her lungs had good air entry bilaterally with bilateral minimal wheezes. (R. at 377.) Dr. Shehzad diagnosed depression with anxiety, COPD, migraine headache, low back pain and constipation. (R. at 377.) On June 27, 2011, Wade complained of depression, back pain and headaches. (R. at 372-73.) Examination showed Wade had normal lungs, paraspinal and vertebral spine tenderness, negative straight leg raising tests bilaterally, normal reflexes and an unremarkable gait. (R. at 372.) On July 6, 2011, Wade complained of left hip pain. (R. at 370-71.) She had moderate left hip tenderness and limited range of motion due to pain. (R. at 370.) Dr. Shehzad diagnosed bursitis of the left hip. (R. at 370.) On August 16, 2011, Dr. Shehzad again reported that Wade had a normal lung examination, as well as lumbar tenderness. (R. at 368-69.)

On September 8, 2011, Dr. Shehzad completed a Physician's Certification of Disability indicating that Wade was disabled from all substantial gainful activity due to a disability that could be improved by more suitable housing conditions. (R. at 410.) Dr. Shehzad did not attribute Wade's disability to a mental or physical impairment. (R. at 410.) On another form titled, "Physician's Certification of Handicapped Status," Dr. Shehzad indicated that Wade's impairments were of such nature that her ability to live independently could be improved by more suitable housing conditions. (R. at 411.) Dr. Shehzad did not attribute Wade's disability to a mental or physical impairment. (R. at 411.) Dr. Shehzad notes lists no restrictions on Wade's work-related abilities.

On September 22, 2011, when Wade was in the midst of divorce proceedings and relocating, she took an overdose of Fioricet, but denied attempting suicide. (R. at 426, 510-12.) On November 23, 2011, Wade reported that she was not doing well, but she had run out of medication one week earlier. (R. at 492.) She

-10-

was very depressed and tearful. (R. at 492.) On December 21, 2011, Wade reported that she was doing well. (R. at 489.) She had a mildly depressed mood and appropriate affect. (R. at 489.) On January 4, 2012, Wade reported doing well, stating that her medications were working well. (R. at 488.) Her thought process was clear and goal directed, and her mood was slightly depressed with congruent affect. (R. at 488.)

On October 19, 2011, Wade complained of low back pain, which radiated into her right leg. (R. at 503.) She reported that a shot administered at an emergency room one day earlier was not effective. (R. at 503.) Dr. Shehzad administered a Toradol injection into Wade's right buttock. (R. at 503-04.) On November 30, 2011, Wade injured her right shoulder when a friend's dog jumped on her. (R. at 501.) Wade was in no acute distress. (R. at 501.) Her lungs were clear to auscultation and percussion bilaterally with no wheezes, rhonchi and rales. (R. at 501.) Dr. Shehzad administered another Toradol injection. (R. at 501-02.) On December 22, 2011, Wade complained of right shoulder pain after falling out of her bed the prior night. (R. at 499.) Wade had limited range of flexion and abduction motion due to pain, but normal extension, some tenderness and no muscle tightness. (R. at 499.) Dr. Shehzad suspected rotator cuff tendinopathy. (R. at 500.)

On January 5, 2012, Wade continued to complain of right shoulder pain. (R. at 497.) She had limited range of motion secondary to pain in her right shoulder. (R. at 497.) Dr. Shehzad referred Wade to a pain management specialist. (R. at 497.) On August 22, 2012, Sabrina Mitchell, F.N.P., a family nurse practitioner who worked with Dr. Shehzad, completed an assessment indicating that Wade could lift and carry items weighing up to 10 pounds. (Plaintiff's Brief In Support

-11-

Case 2:13-cv-00021-PMS   Document 22   Filed 08/29/14   Page 11 of 16   Pageid#: 632

Of Motion For Summary Judgment, ("Plaintiff's Brief"), Docket Item No. 11, Att. I.) She reported that Wade could stand and/or walk a total of 30 minutes to one hour at a time and that she could do so for up to 30 minutes without interruption. (Plaintiff's Brief, Docket Item No. 11, Att. I.) Mitchell reported that Wade could sit two to three hours in an eight-hour workday and that she could do so for 30 minutes to one hour without interruption. (Plaintiff's Brief, Docket Item No. 11, Att. I.) Mitchell opined that Wade could occasionally balance and never climb, stoop, kneel, crouch or crawl. (Plaintiff's Brief, Docket Item No. 11, Att. I.) She opined that Wade's abilities to reach, to handle, to feel and to push and pull were affected by her impairments. (Plaintiff's Brief, Docket Item No. 11, Att. I.) Mitchell found that Wade was restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity and vibration. (Plaintiff's Brief, Docket Item No. 11, Att. I.)

On February 14, 2012, Wade was seen by Dr. Thomas G. Sutton, M.D., at the Pain Management Center of the University of Virginia Health System. (R. at 516-20.) An MRI of Wade's right shoulder confirmed that she had moderate focal tendinopathy of the anterior infraspinatus, tendinosis and a superior labral tear. (R. at 521.) Wade reported that her depression and anxiety were somewhat better controlled since she started taking medication. (R. at 516.) Wade reported that her back pain was slightly better with Lortab and worsened with activity, particularly bending over and upon leaning. (R. at 516.) Dr. Sutton noted that Wade's headaches were well-controlled. (R. at 516.) Wade had some lumbar spine tenderness, negative Patrick's test,[6] a slow but normal gait, full strength except for nearly full strength in her left hip flexion, intact sensation in all extremities and

---

[6] Patrick's test is a test in which the sacroiliac joint is stressed, used to determine the presence of sacroiliac disease. See STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 613 (1995).

-12-

reduced active range of motion in her right shoulder. (R. at 518.) Dr. Sutton ordered a denervation procedure and recommended only NSAIDS for Wade's back pain and arthritis. (R. at 518-19.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

In her brief, Wade argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief at 10-14.) Wade argues that the ALJ erred by giving the opinions of Drs. Sadler and Hartman greater weight. (Plaintiff's Brief at 10-14.) Wade also argues that the Appeals Council erred by failing to address new and material evidence. (Plaintiff's Brief at 14-18.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Wade argues that the ALJ erred by giving the opinions of Drs. Sadler and Hartman greater weight. (Plaintiff's Brief at 10-14.) Both Dr. Hartman and Dr. Sadler opined that Wade had the residual functional capacity to perform light work with certain postural and environmental limitations. (R. at 63-65, 75-77.) The ALJ found their opinions to be consistent with, and well-supported by, the medical evidence of record. (R. at 22.) A medical opinion is entitled to greater weight when it is supported by relevant evidence, "particularly medical signs and laboratory findings," and when it is consistent with the "record as a whole." *See* 20 C.F.R. §§ 404.1527(c)(2)-(4), 416.927(c)(2)-(4) (2013). A medical opinion from an acceptable treating source is given "controlling" weight only when it is "well-supported" by "medically acceptable clinical and laboratory diagnostic findings"

-14-

and when it is "not inconsistent" with the other "substantial" evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ found that Wade had the residual functional capacity to perform light work with certain postural and environmental limitations. (R. at 20.) Dr. Shehzad completed a Physician's Certification of Disability indicating that Wade was disabled from all substantial gainful activity due to a disability that could be improved by more suitable housing conditions. (R. at 410.) Dr. Shehzad did not attribute Wade's disability to a mental or physical impairment. (R. at 410.) On another form titled, "Physician's Certification of Handicapped Status," Dr. Shehzad indicated that Wade's impairments were of such nature that her ability to live independently could be improved by more suitable housing conditions. (R. at 411.) Again, Dr. Shehzad did not attribute Wade's disability to a mental or physical impairment. (R. at 411.) Dr. Shehzad's notes list no restrictions on Wade's work-related abilities.

In fact, clinical tests showed no acute chest abnormalities, and Wade's COPD and emphysema did well with medication. (R. at 292, 295, 302, 323, 326, 334, 350, 355, 368-69, 372, 377-78.) MRI tests confirmed Wade had arthritis, but examination generally showed that she had normal or mildly reduced range of motion, negative straight leg raising tests and a normal gait. (R. at 293, 295, 332-33, 372, 378, 383, 516, 518-19.) Wade's pain management specialist conducted a denervation procedure and then recommended only NSAIDS for her back pain and arthritis. (R. at 518-19.) Wade also reported that her headaches were well-controlled with medication. (R. at 378, 518-19.) Antidepressant medications significantly improved Wade's depressive symptoms and she repeatedly reported that she was doing well. (R. at 333, 431, 433-37, 488-89, 516.) "If a symptom can

-15-

Case 2:13-cv-00021-PMS   Document 22   Filed 08/29/14   Page 15 of 16   Pageid#: 636

be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Based on this, I find that the ALJ properly weighed the medical evidence.

Wade also argues that the Appeals Council erred by failing to address new and material evidence from Sabrina Mitchell, a family nurse practitioner. (Plaintiff's Brief at 14-18.) The Appeals Council did consider this evidence in declining to review the ALJ's decision. (R. at 1-3.) That being the case, this court also must consider this evidence in determining whether substantial evidence supports the ALJ's decision. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). The Appeals Council found that Mitchell's assessment did not provide a basis for changing the ALJ's decision. (R. at 1.) Based on my review of Mitchell's assessment and of the medical evidence of record, I agree. As noted above, Wade's physical examinations generally showed that she had normal range of motion, negative straight leg raising tests and a normal gait. (R. at 293, 295, 332-33, 372, 378, 383, 516, 518-19.) In fact, other than the state agency physicians, none of Wade's treating physicians placed any limitations on her work-related abilities.

It is for all of these reasons that I find that substantial evidence supports the ALJ's findings when considering the whole record, including the assessment from Mitchell. Thus, I find that substantial evidence supports the Commissioner's decision to deny benefits. An appropriate order will be entered.

DATED: August 29, 2014.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE